## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF KANSAS

BRANDON BLACKMON, by and through    )
his conservator, DANIEL J.          )
SEVART,[1]                          )
                                    )
                Plaintiff,          )    **CIVIL ACTION**
                                    )
v.                                  )    No.  05-1030-MLB
                                    )
MARGO CRILE, in her individual      )
capacity acting under color of      )
state law; DEBORAH COCHRAN, in her  )
individual capacity acting under    )
color of state law; TERESA          )
MARKOWITZ, in her individual        )
capacity acting under color of      )
state law; JANET K. SCHALANSKY,     )
in her individual capacity acting   )
under color of state law; VANESSA   )
WELLIVER, in her individual         )
capacity acting under color of      )
state law; and JOHN DOE(S) AND      )
JANE DOE(S), in their individual    )
capacities acting under color of    )
state law.                          )
                Defendants.         )
                                    )

### MEMORANDUM AND ORDER

   This case comes before the court on defendant Janet Schalansky's

---

   [1] Defendants have asserted that Brandon Blackmon is the real party in interest and not his conservator, Daniel Sevart. (Mr. Sevart died in December 2005).  Blackmon has responded that the case was brought by his conservator pursuant to an extended distribution conservatorship.  Blackmon, however, was nineteen years of age at the time this suit was filed.  Moreover, Blackmon has not been adjudicated incompetent.  According to Fed. R. Civ. P. 17(a), "[e]very action shall be prosecuted in the name of the real party in interest.  An executor, administrator, guardian, bailee, trustee of an express trust . . . or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought."  Plaintiff has not asserted that Daniel Sevart is qualified to bring this action under Rule 17(a).  The rules only contemplate a conservator in the case of infancy or incompetency.  Fed. R. Civ. P. 17(c).  Accordingly, the real party in interest would appear to be Brandon Blackmon and he shall be substituted as plaintiff.

motion to dismiss (Doc. 42) and defendants Vanessa Welliver and Deborah Cochran's joint motion to dismiss (Doc. 46). The motions are fully briefed and ripe for decision. (Docs. 43, 47, 48, 49, 50, 51).

## I.   FACTS

This case alleges a violation of Brandon Blackmon's civil rights under 42 U.S.C. § 1983. Blackmon, at age eleven, was adjudicated on March 7, 1997, to be a juvenile offender on the charge of rape. On March 12, 1997, Blackmon was placed in the custody of Kansas Department of Social and Rehabilitation Services. At that time, Blackmon was on suicide watch at the Juvenile Detention Facility (JDF) in Wichita, Kansas. On March 17, 1997, Blackmon banged his head on the walls until he was restrained. Blackmon was then placed in a restraint chair and dressed in a paper gown for at least fifteen minutes. On March 24, 1997, Blackmon tied socks around his neck and banged his head on the wall. Blackmon was again put in a paper gown and secured in the restraint chair for one hour and ten minutes. While at JDF, Blackmon has alleged that the staff consistently violated regulations with regard to his treatment. Blackmon has also alleged that Cochran either knew or should have known of the activities that occurred while he was at JDF. (Doc. 37 at 13-17.)

On March 25, Blackmon was evaluated and diagnosed as suffering from a major depressive disorder, dysthymic disorder and disorderly adolescent disorder. Margo Crile, an employee of SRS, placed Blackmon at Providence Medical Center in Kansas City, Kansas, the same day. While at Providence, Blackmon denied his involvement in the rape. Crile then revoked Blackmon's personal visits with his parents and requested Providence to monitor all phone calls. Blackmon's discharge

summary on April 4 stated that Blackmon was assessed due to his severe recent stress related to his placement at JDF.  While at Providence, Blackmon did not exhibit any self-abusing or destructive behavior. (Doc. 37 at 19-23.)

Blackmon was again transferred to JDF.  On April 19, Blackmon was evaluated by Mark Chaffin, Ph.D.   Dr. Chaffin determined that Blackmon's self-destructive behavior began at JDF from observing older boys.   Dr. Chaffin also found that Blackmon was seriously deteriorating in JDF and the placement was inappropriate for Blackmon. Dr. Chaffin diagnosed Blackmon as suffering from serious depression as a direct result of his placement at JDF.  Dr. Chaffin noted in his report that Crile agreed that placement at JDF was detrimental to Blackmon.

On April 24, Judge Lahey conducted a hearing regarding Blackmon's placement.   Crile testified that she did not disagree with Dr. Chaffin's report but desired to place Blackmon at St. Francis Academy, a Level 6 facility, due to his self-destructive behavior.  Crile made this recommendation even though Dr. Flanders, Director of Clinical Services at St. Francis, determined that placement would be better at a facility that treated pre-adolescents, such as Crittenton or Niles Home.  (Doc. 37 at 19, 24-29.)

Blackmon again returned to JDF and, on May 1, engaged in suicidal behavior.  Blackmon was handcuffed and shackled to the restraint chair for two hours.  Blackmon was then transferred to St. Francis on May 7.   Prior to his transfer, SRS representatives, including Teresa Markowitz and Janet Schalansky, felt that placement at St. Francis was imperative, even though numerous professionals felt that placement was

inappropriate and potentially unsafe.  Blackmon has further alleged that Schalansky had specific and direct knowledge that St. Francis was an inappropriate placement, the facility was not licenced to accept children under the age of twelve and the facility housed violent and aggressive sexual offenders. (Docs. 37 at 30-32, 41 at 4.)

Upon admission to St. Francis on May 7, a psychiatric evaluation was conducted by Dr. Allen Seltzer.  Dr. Seltzer recorded the concern of the "treatment team" that St. Francis may not be an appropriate placement.  Blackmon's medical history noted that he suffered trauma secondary to physical abuse by older detainees while at JDF.  The chart also noted that staff was to be with Blackmon at all times.  On May 12, Dr. Vernon Kliewer recorded that Blackmon should be in a treatment program with his own age group.  On May 15, Dr. Seltzer recorded that Blackmon was depressed and St. Francis was an inappropriate placement.  (Doc. 37 at 32-33.)

On June 11, Blackmon was attacked by his older roommate which caused a 1.5" to 2" laceration on his scalp.  On June 12, the treatment team noted that further episodes could occur since St. Francis was an inappropriate placement for Blackmon.  On June 21, Blackmon was sexually battered by another resident.  Crile was informed and she instructed staff to prohibit all communications with Blackmon's mother.  (Doc. 37 at 36-37.)

Blackmon was administratively discharged from St. Francis because the facility could not insure his safety.  St. Francis advised Blackmon's chief prosecutor that the placement was inappropriate and the treatment team thought an appropriate placement was a pre-adolescent unit, in-home placement or a therapeutic foster home.

-4-

Judge Lahey recommended that SRS find an out of home placement at a pre-adolescent facility. Blackmon was instead returned to JDF on July 11. During his time at JDF, Blackmon did not receive any therapeutic services. (Doc. 37 at 41-44.)

On August 11, Blackmon was placed in Jeannette Smith's foster home in Kansas City. Blackmon alleges that Smith made derogatory remarks about his mother, failed to properly care for his needs, physically struck him and consumed alcoholic beverages. During his time at the foster home, Blackmon has alleged that his therapist, Mr. Todd, in conjunction with Vanessa Welliver of SRS sought to terminate communications with his family. (Doc. 37 at 46).

On February 19, 1998, Blackmon was admitted to the University of Kansas Medical Center (KU) for in-patient treatment. The medical staff at KU advised Welliver that Blackmon's anger was directly related to his placement. Blackmon desired to return home and medication had been unsuccessful.

On March 13, the Kansas Supreme Court reversed Blackmon's adjudication for rape. See In the Matter of B.M.B., 264 Kan. 417, 955 P.2d 1302 (1998). SRS, however, did not return Blackmon to his home. Blackmon's only remaining adjudication was for criminal damage to property on April 25, 1996, a Class B, Non-Person Misdemeanor. KU's discharge summary noted that SRS was blocking all communication between Blackmon and his mother. The records also reflected that the KU staff tried to chemically restrain Blackmon by administering Tegretol. Blackmon was then sent to Rainbow Mental Health on March 18. (Doc. 37 at 46-49.)

At Rainbow, Blackmon was not allowed any contact with his family.

-5-

On March 27, Blackmon was battered by a resident.  On April 12, Blackmon was again battered by the same resident.  On April 13, Blackmon was moved to another hall at Rainbow.  On April 26, Blackmon was attacked by a different resident.  Blackmon was constantly fearful of the other residents.  The staff at Rainbow consistently gave him Haldol injections to restrain him.  On May 7, Rainbow sent a letter to Welliver that informed her of Blackmon's continued desire to return home and that he was having a difficult time bonding with his caretakers.  On May 9, Blackmon was released from Rainbow and placed with Pastor Ritchey.  (Doc. 37 at 49-52.)

On July 2, 1998, Judge Lahey conducted another disposition hearing.  Dr. Romerein testified and recommended home placement. Judge Lahey terminated SRS custody and returned Blackmon to his mother.  (Doc. 37 at 55.)

Defendants Schalansky, Welliver and Cochran have filed motions to dismiss on the basis of qualified and quasi-judicial immunity.

**II.  Motion to Dismiss Standards: FRCP 12(b)(6)**

The standards this court must utilize upon a motion to dismiss are well known.  This court will dismiss a cause of action for a failure to state a claim only when it appears beyond a doubt that the plaintiff can prove no set of facts that would entitle legal relief or when an issue of law is dispositive. See Ford v. West, 222 F.3d 767, 771 (10th Cir. 2000); Robinson v. Kansas, 117 F. Supp.2d 1124, 1129 (D. Kan. 2000).  All well-pleaded facts and  the reasonable inferences derived from those facts are viewed in the light most favorable to plaintiff. See Ford, 222 F.3d at 771; Davis v. United Student Aid Funds, Inc., 45 F. Supp.2d 1104, 1106 (D. Kan. 1998).

-6-

Conclusory allegations, however, have no bearing upon this court's consideration.  See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (stating that "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based"); Overton v. United States, 74 F. Supp. 2d 1034, 1041 (D. N.M. 1999) (citing Dunn v. White, 880 F.2d 1188, 1190 (10th Cir. 1989)). In the end, the issue is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims.  See Robinson, 117 F. Supp.2d at 1129.

**III. ANALYSIS**

### A.   Quasi-Judicial Immunity

"Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed by that order."  Turney v. O'Toole, 898 F.2d 1470, 1472 (10th Cir. 1990)(internal citations omitted).  Quasi-judicial immunity, however, only extends to acts prescribed by the judge's order.  Id. at 1474. Presumably the order was simply an order of custody.  The complaint alleges that the judge recommended certain placements, but does not suggest that the judge ordered specific placements after SRS was ordered custody.  Moreover, the allegations support a finding that the judge was influenced by SRS' recommendations.  Blackmon, however, is not alleging a violation of his rights based on his placement into SRS custody.  Rather, Blackmon's allegations focus on the activities that occurred in the individual facilities after placement and the placement decisions made by SRS.  Accordingly, defendants are not

accorded absolute immunity.  Id.

**B.   Qualified Immunity**

Blackmon seeks monetary damages pursuant to 42 U.S.C. § 1983. That statute renders liable any person who "under color of [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  Section 1983 was enacted to provide protections to those persons wronged by the misuse of power.  While the statute itself creates no substantive civil rights, it does provide an avenue through which civil rights can be redeemed.  See Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995) ("Section 1983 creates no substantive civil rights, only a procedural mechanism for enforcing them.").

"Although summary judgment provides the typical vehicle for asserting a qualified immunity defense, [the court] will also review this defense on a motion to dismiss" but will "not dismiss a complaint 'for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Peterson v. Jensen, 371 F.3d 1199, 1201-02, (10th Cir. 2004) (quoting Currier v. Doran, 242 F.3d 905, 917 (10th Cir. 2001)).  In the past, the Tenth Circuit has required a plaintiff to meet a heightened pleading standard upon a defendant's assertion of qualified immunity.  Currier, 242 F.3d at 911.  The Tenth Circuit in Currier held, however, that this heightened pleading requirement does not survive the Supreme Court's opinion in Crawford-El v. Britton, 523 U.S. 574, 118 S. Ct. 1584, 140 L. Ed.2d 759 (1998).  Id. at 916.

-8-

The framework for reviewing a qualified immunity defense is well settled.  The first step is to determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).  In other words, the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002).  "Only after determining that [the plaintiff] has alleged a deprivation of a constitutional right, does this court ask whether the right allegedly violated was clearly established at the time of the conduct at issue." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255 n.6 (10th Cir. 1998).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)).

Blackmon has asserted that his right to be safe, free from harm and provided adequate care was violated and that this right was clearly established at the time of the violation.  The court agrees. In Yvonne L., By and Through Lewis v. New Mexico Dept. of Human Services, 959 F.2d 883 (10th Cir. 1992), the circuit held "that children in the custody of a state had a constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs." 959 F.2d at 893.  The circuit established that foster children had a

-9-

clearly established right to protection while in foster care based on its previous decision in Milonas v. Williams, 691 F.2d 931 (10th Cir. 1982), cert. denied, 460 U.S. 1069, 103 S. Ct. 1524, 75 L. Ed.2d 947 (1983). Milonas determined that "juveniles involuntarily placed in a private school by state agencies or courts had liberty interests protected by the Due Process Clause of the Fourteenth Amendment; specifically, [s]uch [a] person has the right to reasonably safe conditions of confinement." Yvonne L., 959 F.2d at 892-93 (citing Milonas, 691 F.2d at 942). Specifically, Milonas held that juveniles "have the right to reasonably safe conditions of confinement, the right to be free from unreasonable bodily restraints, and the right to such minimally adequate training as reasonably may be required by these interests." 691 F.2d at 942. Blackmon's allegations have sufficiently alleged a violation of his constitutional rights while he was in the custody of the state of Kansas.

In determining whether defendants are entitled to qualified immunity, the court must look to each individual defendant to determine whether he or she "acted under color of state law and caused or contributed to the alleged violation." Smith v. Barber, 195 F. Supp.2d 1264, 1274 (D. Kan. 2002); Currier v. Doran, 242 F.3d 905, 919 (10th Cir. 2001). While Blackmon is not held to a heightened pleading standard, they "must show the defendant personally participated in the alleged violation ... it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation." In addition, Blackmon "must establish a deliberate, intentional act by the supervisor to violate constitutional rights." Id. at 1274. "This standard may be satisfied by a showing that a

-10-

defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance." Id.

### 1.    Janet Schalansky

Schalansky argues that Blackmon has failed to allege any specific, factual allegations to support a claim against her. Blackmon has alleged that Schalansky, Deputy Secretary of SRS, insisted that he be placed at St. Francis despite her actual knowledge of numerous professionals opining that such placement would be harmful.  Moreover, Blackmon has alleged that Schalansky had direct and specific knowledge that he would be in danger at St. Francis because of the violent and aggressive nature of its residents. Blackmon's allegations, if true, are sufficient to state a section 1983 claim.  Blackmon has clearly alleged that Schalansky violated his clearly established right to be free from harm while placed in an institution and the Tenth Circuit has held that officials will be liable they make a placement that "they know or suspect to be dangerous to the children." Yvonne L., 959 F.2d at 892-93.  Blackmon has also sufficiently alleged that he was harmed at St. Francis by other residents.

Defendant Schalansky's motion to dismiss (Doc. 42) on the basis of qualified immunity is denied.

### 2.    Deborah Cochran

Cochran asserts that Blackmon's claim must be dismissed since Blackmon has failed to allege any personal participation in the alleged violations.  Blackmon responds that he has alleged that Cochran "had a duty to know, and knew or should have known, of the violations . . . visited upon him by JDF staff and failed to take any

actions to prevent such violations." (Doc. 50 at 8.) While at JDF, Blackmon failed to receive mental health services, was physically battered by much larger detainees and was restrained at least six times in a chair and leg shackles for up to two hours. These allegations clearly support a conclusion that Blackmon's rights to be safe and under proper care were violated.

Cochran argues that while Blackmon may have stated a claim against Crile, Cochran, as Crile's supervisor, cannot be personally liable unless Blackmon can demonstrate an affirmative link through facts showing that she actively participated or acquiesced in the violation. (Doc. 50 at 8.) "A plaintiff may show that an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, [her] exercise of control or direction, or [her] failure to supervise." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1187 (10th Cir. 2001)(internal citations omitted). Blackmon has alleged that Cochran knew, or should have known, of the numerous violations committed by JDF staff and that Cochran either personally participated, exercised control or failed to supervise Crile. (Doc. 37 at ¶¶ 58, 59, 94, 171.) As long as a set of facts would entitle Blackmon to relief, the court cannot dismiss his claim. While Blackmon's allegations that Cochran "had a duty to know" and "should have known" are not sufficient to state a claim, Blackmon has also alleged that Cochran "knew" of the violations. These allegations are sufficient to survive Cochran's motion to dismiss but unless evidence is developed during discovery regarding Cochran's knowledge and participation, Cochran will be

entitled to summary judgment on her qualified immunity claim.[2]

Cochran further asserts that Blackmon has failed to state a claim under the professional judgment standard.  The Tenth Circuit has addressed the difference between the deliberate indifference and professional judgment standards in Yvonne L.:

> In [Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed.2d 251 (1976)], the Supreme Court held that if prison officials display deliberate indifference to a prisoner's serious illness or injury, they violate the Eighth Amendment right against cruel and unusual punishment.  The Second and Eleventh Circuits appear to have adopted this standard in cases involving the constitutional right of children in state custody to reasonable safety while in foster care environment.  Plaintiffs argue that the Eight Amendment standard is inappropriate, and urge that we adopt the standard that the Supreme Court applied in Youngberg, 457 U.S. at 323, 102 S. Ct. at 2462. The Youngberg Court held that a mentally retarded person committed to a state institution had a Fourteenth Amendment right to reasonable protection from physical harm.  The standard set out in Youngberg was that state officials would be shielded from liability unless the defendants showed that they failed to exercise professional judgment. This standard has been adopted by the Seventh Circuit.  As applied to a foster care setting we doubt there is much difference in the two standards.  "Failure to exercise professional judgment" does not mean mere negligence as we understand Youngberg; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements.  To the extent there is a difference in the standards, we agree with the Seventh Circuit that the Youngberg standard applies. The compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily committed patients, are "entitled to more considerate treatment and conditions" than criminals.

959 F.2d at 893-94 (internal citations omitted).

The court agrees that the professional judgment standard applies. While Blackmon was not adjudicated a child in need of care, but rather a juvenile, Kansas law does not treat juveniles as criminals.

---

[2] The magistrate judge is directed to schedule discovery so that this issue can be resolved at an early date.

> In Kansas, we have long recognized that under the law, a juvenile is not to be treated the same as an adult. The Juvenile Offenders Code (Code) is to be "liberally construed to the end that each juvenile coming within its provisions shall receive the care, custody, guidance, control and discipline, preferably in the juvenile's own home, as will best serve the juvenile's rehabilitation and the protection of society."  K.S.A. 38-1601. Proceedings under the Code are considered civil proceedings and not criminal. The State acts as parens patriae for the best interests and welfare of the child.

Matter of B.M.B., 264 Kan. 417, 432, 955 P.2d 1302, 1312 (1998).

Accordingly, it would be appropriate to apply the professional judgment standard in civil rights violations of those children the state has adjudicated juveniles, as well as foster children.  The court finds that Blackmon has sufficiently stated a claim under the professional judgment standard.  Cochran's alleged knowledge of the numerous violations of Blackmon's rights while at JDF and her continued approval of placement in the facility would support the conclusion that she abdicated her professional duty to act.

Cochran's motion to dismiss on the basis of qualified immunity is denied.

### 3.  Vanessa Welliver

Welliver asserts that Blackmon's allegations against her are insufficient to state a claim.  Blackmon responds that Welliver knew that Jeanette Smith made derogatory remarks concerning Blackmon's mother, antagonized Blackmon's mother, failed to care for Blackmon, assaulted Blackmon and consumed alcoholic beverages.  Blackmon has also asserted that Welliver encouraged and approved sexual offender treatment after it was apparent that the treatment was contra-indicated and Blackmon's conviction was overturned and Welliver restricted communications with his family.  (Doc. 50 at 6.)

-14-

Blackmon's complaint, however, does not support his assertions. While Blackmon has alleged that Smith assaulted him, made derogatory remarks and consumed alcholic beverages, it does not allege that Welliver knew about Smith's conduct either before, during or after his placement.  (Doc. 37 at ¶ 138.)  Moreover, after searching the complaint, the court cannot find any allegations to support that Welliver encouraged and approved the sexual offender treatment or restricted communications with his family.  The only allegation pertaining to Welliver about family communications was that she transmitted instructions to Rainbow that Blackmon be allowed to contact his family. (Doc. 37 at ¶ 149.)  There is no allegation that Welliver was the individual who revoked the privilege in the first instance.[3]

The court finds that Blackmon's complaint fails to state a claim against Welliver.  Accordingly, Welliver's motion to dismiss is granted.

## IV.   CONCLUSION

Defendant Schalansky's motion to dismiss (Doc. 42) is denied. Defendant Cochran's motion to dismiss is denied and defendant Welliever's motion is granted.  (Doc. 46.)

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been

_____

[3] At this point, the court does not need to determine whether family contact while in the state's custody is a constitutional right.

-15-

obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this   30th   day of January 2006, at Wichita, Kansas.

s/ Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE

-16-